Carl E. DAVIS, individually; Class A All Black Professional Employees of the Disability Determination Service, Alabama State Department of Education, Who Were Denied, May Have Been Denied, or May be Denied Promotions to the Positions of Examiner II, Examiner III, Supervisor I, and Supervisor II from 1977 Until the Present; Class B: All Black Professional Employees of the Disability Determination Service, Alabama State Department of Education, who were Denied, May Have Been Denied, or May be Denied Appointment to the Position of Assistant Unit Supervisor From 1977 Until the Present, Plaintiffs,

v.

ALABAMA DEPARTMENT OF EDUCATION, DEPARTMENT OF DISABILITY DETERMINATION SERVICE; the Personnel Board of the State of Alabama, Defendants.

No. 82–G–1411–S.

United States District Court, N.D. Alabama, S.D.

March 26, 1991.

1472

Michael Quinn, Gordon, Silberman, Wiggins & Childs, Birmingham, Ala., for plaintiffs.

Charles S. Coody, Jeffery A. Foshee, State Dept. of Educ., Ronald Forehand, Richard Meadows, Atty. General's Office, State of Ala., Montgomery, Ala., William F. Gardner, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, Senior District Judge.

This case filed in 1982 was tried in 1986 and decided by this court in 1987. *Davis v. Alabama Department of Education,* 43 EPD ¶ 37,226, 1987 WL 18246 (N.D.Ala. 1987). On the plaintiffs' appeal, the court of appeals affirmed in part and reversed and remanded in part. *Powers v. Alabama Department of Education,* 854 F.2d 1285 (11th Cir.1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989).[1]

The aspects of the case which were remanded concerned (1) the selection of Examiners for the position of Assistant Unit Supervisor [hereinafter AUS], to be resolved by this court "on the evidence already presented," and (2) the job progression and minimum experience procedures.

In compliance with the court of appeals' mandate, the AUS issue has been resolved by this court. The resolution of the AUS issue has resolved the contentions asserted with respect to the segment of the class (referred to as "Class B") defined as "All black professional employees of the Disability Determination Service, Alabama State Department of Education, who were

---

1. The caption of the case in the court of appeals used the name of Larry Powers, who exited the case through voluntary dismissal as a named plaintiff shortly after the complaint was filed in 1982.

denied, may have been denied, or may be denied appointment to the position of Assistant Unit Supervisor from 1977 until the present."

The remaining issue concerns the segment of the class (referred to as "Class A") defined as "All black professional employees of the Disability Determination Service, Alabama State Department of Education, who were denied, may have been denied, or may be denied promotions to the positions of Examiner II, Examiner III, Supervisor I, and Supervisor II from 1977 until the present." On this point, the court of appeals held that:

> The case should be retried so that the plaintiffs can more clearly show, with their own evidence, that the job-progression and minimum experience requirements perpetuated past discrimination and the defendants either that the requirements did not have such an effect or that they were necessary for the agency to operate. The parties should be aware, however, that those issues are the only promotion issues still in the case, and the only ones as to which evidence should be admitted.

854 F.2d at 1299.

To place this issue in perspective, it should be noted that:

> First, the job progression and minimum experience procedures were not among the plaintiffs' contentions when this case was tried in 1986. The plaintiffs' contention for Class A at the 1986 trial was that the service rating or performance appraisal component of the promotion procedure resulted in discrimination, and that issue concluded with the court of appeals' decision. The job progression and minimum experience procedures became contentions on appeal through the process then authorized by *Griffin v. Carlin*, 755 F.2d 1516 (11th Cir.1985). Accordingly, it would be a misnomer to say that this case has been "retried" on the job progression and minimum

experience procedures. It has instead now been tried on those procedures.[2]

> Second, the court of appeals' decision in this case in 1988 antedated the Supreme Court's decision in 1989 in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). This in turn has led to the plaintiffs' contention that the issue should be resolved in the context of the court of appeals' pre-*Wards Cove* phraseology of the defendants having the burden of proving that the procedures are "necessary for the agency to operate" and the defendants' contention that the issue is to be resolved in the context of the Supreme Court's 1989 standard of producing evidence that the procedures "serve, in a significant way, the legitimate employment goals of the employer."

The defendants' position is supported by the settled principle that an intervening Supreme Court decision is to be followed as an exception to the law of the case doctrine.[3] Nevertheless, it is unnecessary to resolve the point because on the evidence presented, the defendants have satisfied both the pre-*Wards Cove* standard and the *Wards Cove* standard.

The job progression and minimum experience procedures were tried to the court at bench trial on the three days of October 22–24, 1990. These Findings of Fact and Conclusions of Law on the subject are now entered by the court.

## FINDINGS OF FACT

### I. GENERAL

1. The Disability Determination Service [hereinafter DDS] of the Alabama Department of Education handles Social Security disability claims pursuant to an arrangement with the Social Security Administration. There are similar disability determination agencies in all states. The Alabama

---

**2.** The Eleventh Circuit has indicated that the *Griffin* process is no longer authorized in light of *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). *See Hill v. Seaboard Coast Line R. Co.*, 885 F.2d 804, 813, n. 16 (11th Cir.1989).

**3.** E.g., *Stanley v. United States*, 786 F.2d 1490, 1497–98 (11th Cir.1986), *cert. denied, Board of Regents of University of Maryland v. Stanley*, 483 U.S. 1020, 107 S.Ct. 3262, 97 L.Ed.2d 761 (1987).

DDS has offices in Birmingham and Mobile, Alabama. R. 176.

2. The Alabama DDS was established in 1976. R. 176.

3. The Director of the Alabama DDS is Dr. Albert McCoy, who has held this position since 1988. Before then, he had been the Director of the Connecticut DDS for approximately four years. R. 253.[4]

4. In the past, there was a job at the Alabama DDS known as Examiner Assistant, which was eliminated by the State Reclassification Study in 1982. R. 176–77.

5. The Disability Determination Examiner and Supervisor jobs at the Alabama DDS are the professional jobs which have the role of adjudicating Social Security disability claims. R. 178. These jobs, in ascending order, are as follows:

Examiner I (E–1)
Examiner II (E–2)
Examiner III (E–3)
Supervisor I (S–1)
Supervisor II (S–2)
Supervisor III (S–3)

6. This sequence of jobs is known at the Alabama DDS as "the career path." R. 179. At the Connecticut DDS of which Dr. McCoy was the Director before becoming Director of the Alabama DDS, the comparable jobs are known as "the career ladder." R. 255.

7. The "job progression" issue concerns the procedure of working each job in the career path in order. The "minimum experience" issue concerns the procedure that employees are to work each job for at least a year before progressing to the next job in the career path.

## II. HAVE THE PROCEDURES BEEN ADHERED TO?

8. For purposes of disparate treatment analysis, consideration will first be given to whether the job progression and minimum experience procedures have been adhered to with respect to both white and black employees. The evidence established that they have in fact been adhered to and applied equally to both white and black employees.

9. Due to a reduction in federal funding, the Vocational Rehabilitation Division of the Alabama Department of Education had to reduce the number of employees in 1981. Those to be affected by the reduction in force [hereinafter "RIF"] were given the option to transfer to the Alabama DDS at the job grade which they were then holding so that, for example, a Vocational Rehabilitation Counselor II could transfer as a Disability Determination Examiner II. The employees who transferred under this RIF option in 1981 were both white and black. Most of them have returned to the Vocational Rehabilitation Division. R. 180–81.[5]

10. With the exception of the 1981 RIF at the Vocational Rehabilitation Division, no white person has (a) started with the Alabama DDS at any time since it was established in any job other than the entry level jobs of Examiner Assistant (which was eliminated in 1882) or Examiner I, (b) by-passed or skipped any job in the career path, or (c) worked any job in the career path for less than one year before progressing to the next job. R. 181.

11. The plaintiffs have asserted that there have been 17 whites who started with the DDS in jobs above the Examiner I job. Such assertion was based on a list provided to the plaintiffs years ago, so there is no suggestion of impropriety in the assertion, but the list and the assertion built on it were not correct. Based on a review of records at the State Personnel Department as well as the DDS, the defendants established without dispute that each of the 17 whites in question in fact started in an entry level Assistant job or Grade I job. R. 307–12.[6]

---

4. It might be noted that Dr. McCoy is black.

5. One of the plaintiffs was in the group which transferred to DDS in 1981 in the cutback at Vocational Rehabilitation. R. 49, 51–53.

6. No contention was addressed by the plaintiffs to the State Personnel Department, but the term "the defendants" will be used herein for convenient reference.

## III. HAVE THE PROCEDURES PERPETUATED PAST DISCRIMINATION?

■ 12. The court of appeals remanded for the plaintiffs to show "that the job-progression and minimum experience requirements perpetuated past discrimination." 854 F.2d at 1299. At the trial in October 1990, the plaintiffs attempted to make such a showing through the theories to be analyzed in this section.

### A. Footnote 22:

13. The plaintiffs argue that the perpetuation of past discrimination theory is established by the footnote 22 comment in the Eleventh Circuit's opinion regarding the number of black persons employed in the 1960's and from 1970 to 1974 and the fact that the DDS (like all state agencies) operates under the order in *United States v. Frazer*, 317 F.Supp. 1079 (M.D.Ala.1970). *See* 854 F.2d at 1299, n. 22.[7]

14. The plaintiffs are correct in the position that the limited evidence on the subject reveals a sparse hiring of black persons by the Vocational Rehabilitation Division in the era of the 1960's and early 1970's and that *Frazer* held there was discrimination in hiring in state employment.[8] But the plaintiffs are attempting to travel farther on footnote 22 than it will carry them. The question here is not whether there was past discrimination in the 1960's and early 1970's, but rather, whether past discrimination has been perpetuated with respect to the plaintiffs by the job progression and minimum experience procedures.

15. It can be said that there may be black persons today, employed elsewhere or retired, who may have been discriminated against in the 1960's or early 1970's by not being hired by the Vocational Rehabilitation Division.[9] But the facts are that the plaintiff class in this case consists of persons who were hired and do not contend they should have been hired earlier than they were hired. *Compare Watkins v. United Steelworkers of America, Local No. 2369*, 516 F.2d 41, 44–45 (5th Cir.1975) (upholding layoffs, "regardless of an earlier history of employment discrimination ... where the individual employees who suffer layoff under the system have not themselves been the subject of prior employment discrimination.").

16. Moreover, there is no evidence and no contention that anyone in the plaintiff class may have been discriminated against by not being hired before they were in fact hired. Lead plaintiff Carl Davis, for one, testified that he had no complaint in connection with his hiring in 1976. R. 16. If the plaintiffs had presented evidence that some class members should have been hired earlier than they were, a different situation may well have been established, but there was no such evidence.

### B. The Examiner Assistant Job:

17. The principal foundation of the plaintiffs' effort to show a perpetuation of past discrimination was the theory that black employees were discriminately hired into the now defunct Examiner Assistant job, thus impeding their progression in the career path of Examiner I upward.

18. With the Examiner Assistant job having been eliminated by the State Reclassification Study in 1982, the plaintiff's contention is that class members hired into the Examiner Assistant job before 1982 were subjected to past discrimination, which has been perpetuated by the job progression and time-in-grade procedures. This contention could be and presumably is asserted with respect to some but not all of the members of Class A because some but not

---

7. Since the DDS was not established until 1976, it can be assumed the footnote comment had reference to the employment profile of the Vocational Rehabilitation Division in the 1960's and early 1970's.

8. It might be noted that *Frazer* antedated by two years the extension by Congress of Title VII to governmental employment in 1972.

9. The phrase "may have been" would seem appropriate since nothing is known about the number of black persons who applied for employment in that era, or their qualifications, or their ranking on the registers.

all of the black professional employees started in the Examiner Assistant job. Lead plaintiff Carl Davis, for example, was hired in 1976 in the Examiner I job. R. 16.

19. During the time the Examiner Assistant job existed, both white and black persons started in that job. There could be no contention that black persons were hired only into the Examiner Assistant job because the witnesses at the trial included black persons who started on the Examiner I job, those being Carl Davis in 1976, R. 11, Antris Hinton in 1981, R. 26–27, Denise Bledsoe in 1986, R. 106, Sheridan Osborne in 1981, R. 131, and Robert Singleton in 1976, R. 143.

20. Class members who started on the Examiner Assistant job agreed that white persons similarly started on the job, as illustrated by the following:

(a) One witness was hired in the Examiner Assistant job in 1980 and is today holding the Examiner II job. She agrees there were white employees who were hired in the Examiner Assistant job in 1980 and who are today holding the Examiner II job, including a white employee hired on the same day she was. R. 46–47.

(b) Another witness started in 1979 on the Examiner Assistant job. She agrees that a white employee started on the Examiner Assistant job the same week she did. R. 103.

21. There is no evidence that black persons were disproportionately hired into the Examiner Assistant job. The evidence introduced at the 1990 trial established that of the present and former employees who have been employed since 1977, 75 whites and 24 blacks started in the Examiner Assistant job and 129 whites and 53 blacks started in the Examiner I job. Defendants' Exhibits 9 and 10.[10] In percentage terms:

(a) 37 per cent of the white hires and 31 per cent of the black hires started in the Examiner Assistant job, with the result that a higher percentage of white

persons started in the Examiner Assistant job, and

(b) 63 per cent of the white hires and 69 per cent of the black hires started in the Examiner I job, with the result that a higher percentage of black persons started in the Examiner I job.

*C. Summary:*

22. There was no other theory or contention which the plaintiffs pursued at the 1990 trial in attempting to show any past discrimination perpetuated by the job progression and minimum experience procedures.

23. On the evidence presented, the court finds that the job progression and minimum experience procedures have not perpetuated any past discrimination and concludes that the plaintiffs have failed to satisfy this element of their case.

## IV. DID THE PLAINTIFFS ESTABLISH A PRIMA FACIE CASE?

24. Evidently anticipating that they could not prevail on the perpetuation of past discrimination theory, the plaintiffs attempted to establish a prima facie case of disparate impact resulting from the job progression and minimum experience procedures. Since the remand was phrased in terms of providing the plaintiffs with the opportunity to show a perpetuation of past discrimination, 854 F.2d at 1299, it could be argued that the inquiry should end with their failure to show any such perpetuation, but the case will now be analyzed in terms of their prima facie case contention.

25. The plaintiffs' prima facie case contention is based on statistics. Through their expert witness, Dr. Edwin Luther Bradley, the plaintiffs say they have satisfied the *Wards Cove* standard "that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and non-

---

**10.** This includes hires before DDS was established in 1976. The comparable pre–1976 jobs in the Vocational Rehabilitation Division were Rehabilitation Counselor Assistant and Rehabilitation Counselor I.

whites." 490 U.S. at 656–57, 109 S.Ct. at 2124–25, 104 L.Ed.2d at 751.

26. Based on the statistical model and computations which he prepared, Dr. Bradley concluded that with the job progression and minimum experience procedures, there was adverse impact with respect to the jobs from Examiner III to Supervisor III. R. 160.

27. At the same time, Dr. Bradley further testified that:

Q—Is it accurate to say, Dr. Bradley, that statistical computations can tell us whether or not an association probably occurred by random chance or probably did not occur by random chance?

A—That's correct.

Q—Would it be accurate to say that statistical computations do not tell us anything about causation?

A—In this particular situation, that's correct.

R. 161.

Accordingly, the plaintiffs failed to satisfy the proximate cause element of *Wards Cove*. As the Court there said:

As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case in a disparate-impact suit under Title VII.

490 U.S. at 657, 109 S.Ct. at 2124–25, 104 L.Ed.2d at 751.

28. Moreover, the statistical computations prepared by and presented to the court through Dr. Bradley are based on a model which cannot be accepted. This is illustrated by the following examples:

(a) The model which he has constructed assumes that a new hire who has been on the Examiner I job for one day would be qualified for the Supervisor III job. R. 173. The fallacy of such a predicate assumption becomes even more pronounced when considered in light of the fact that there are only three persons on the Supervisor III job, of whom one is in charge of the Mobile office, one is Medical Relations Coordinator, and one is Chief of Operations. R. 194–95.

(b) The model used by the plaintiffs assumes that there are 154 employees (116 white and 38 black) who are qualified for the Supervisor III job, although there are only three persons on the job. R. 163–64.[11]

(c) The plaintiffs' model does not consider actual qualifications or knowledge, skills, and abilities. R. 165. It was accurately described by the defendants' expert, Dr. Ephraim Asher, as based on the fungibility or "warm body" hypothesis which assumes that every person is just as qualified and skilled and experienced as everyone else. R. 331.

29. The testimony of Dr. Ephraim Asher, the defendants' expert in the field of statistics as applied to labor economics, pointed out the fallacies inherent in the plaintiffs' statistical model and resultant computations and conclusions. The imaginary numbers used in the model are based on an assumption of fungibility among individuals, a theoretical concept using numbers which have not been validated. The fungibility theory assumes that individuals in an economic environment are perfect substitutes for one another without loss of efficiency, i.e., one warm body is as good as another. The fungibility assumption implies that regardless of job performance, proficiency and efficiency, inherent qualifications, and job related characteristics such as seniority, individuals are perfect substitutes for one another.[12] Unless the assumption is validated by definition, anything that is based on it becomes invalid

---

**11.** On rebuttal, Dr. Bradley revised his computations, with the result of showing 182 persons (124 white and 58 black) qualified for the Supervisor III job. R. 361.

**12.** Dr. Asher stated: "To assume fungibility would be similar to or akin to assuming that in an airline industry a flight attendant can as

efficiently and effectively fly, take off and land a complex jumbo jet just like any other trained pilot. In a hospital atmosphere, such an assumption would imply that an OR nurse can perform as efficiently and effectively a brain surgery like a trained physician and so on."

and inaccurate. The inaccurate assertion of plaintiffs that 154 people are qualified to perform the job tasks of a Supervisor III, when only three people are qualified, is based on fungibility. The assumption is wholly inappropriate.

30. From all the evidence on the subject, the court finds that the procedures at issue have not been shown by the plaintiffs to have a discriminatory impact.

## V. DID THE DEFENDANTS JUSTIFY THE PROCEDURES?

31. While the facts as found from the evidence produce the conclusion that the plaintiffs have not shown a perpetuation of past discrimination or a prima facie case from statistics, the goal of finally resolving this long-running case necessitates further inquiry. Assuming arguendo the plaintiffs established that which they have not established, the question then is whether the defendants have justified those procedures.

### A. The Job Progression Procedure:

32. The bulk of the plaintiffs' evidence at trial was addressed to the theory that there is no difference between any of the Examiner and Supervisor jobs and that everyone in every job does the same thing, except the Supervisors have lighter workloads. It is therefore appropriate to begin by considering the plaintiffs' evidence on the subject.

33. The emphasis which the plaintiffs placed on his contention was revealed as soon as the curtain went up on the evidence when the plaintiffs' lead-off witness gave the answer before he was asked the question:

Q—Are you familiar with the job requirements for an Examiner III?

A—Yes.

Q—And from what have you gathered that information?

A—There's really no difference.

R. 12.

34. The plaintiffs' evidence on the subject was too strained and unrealistic to be accepted as credible. For example, one of the plaintiffs' witnesses testified that she is qualified to be the Director, the position held by Dr. McCoy. R. 135. The theme repeated by one witness after another that all the Examiners and Supervisors do the same thing but with the Supervisors having lighter workloads bore all the hallmarks of a "litigation vision" view.

35. The degree of reliability in the plaintiffs' evidence on the subject is underscored by the change in the plaintiffs' position on the position of Assistant Unit Supervisor. At the present, and since the State Reclassification Study in 1982, the position of Assistant Unit Supervisor has been filled from the ranks of the Examiner III job. One of the witnesses who testified there is no difference in the Examiner and Supervisor jobs had testified at the 1986 trial that being an Assistant Unit Supervisor means "Experience, additional knowledge of the job, working closely with the supervisor and promotional benefits in the future." At the 1990 trial, she testified as follows:

Q—That was your answer, wasn't it?

A—Yes, on there it was.

Q—Now, you disagree with that today?

A—Yes. Because so many other things have come up since that time.

R. 102.

36. Another change of position by the plaintiffs consisted of their testimony at the 1990 trial that reconsideration cases (which are handled by the Examiner II and III jobs) are easier than initial claims cases (which are generally handled by the Examiner I job). A plaintiff who so testified at the 1990 trial had this to say regarding her testimony on the subject at the 1986 trial:

Q—. . . On page 314, and I was asking you questions then, too, at line 16, I asked you the question, "The fact is that recon work is higher level work than initial examiner work, isn't it?" And would you read your answer, please, ma'am?

A—It has, "It is." But at the same time, that's not really stating whether or not you're asking my opinion or if you're

asking the agency's opinion as far as how they class that type of work. R. 40.

37. The degree of confidence which the court could have in the plaintiffs' position is further shown by the testimony of a witness for the plaintiffs that:

Q—... My question is on the very first day that you became an Examiner I, is it your testimony that you were as qualified that day to do any and all work of Examiners I, II and III as you were on your last day of employment?

A—Yes.

R. 38.

38. The plaintiffs contend that the Supervisors do nothing except prepare evaluations and attend meetings. This contention was refuted by the plaintiffs' further testimony on the subject, as illustrated by the following:

(a) One witness who so testified went on to testify that she received training from her Supervisor for six months and that questions asked by Examiners are usually asked of and answered by the Supervisors.

R. 31–33.

(b) Another witness who testified that all the Supervisors do is evaluations went on to testify that they are responsible for reviewing the work for accuracy and pointing out mistakes to employees.

R. 138.

39. The actual meaning of the contention that the Examiners and Supervisors all perform the same work except for Supervisors having lighter workloads was revealed by the plaintiffs' witnesses who explained the meaning as being that the work is technically the same in the sense of the Social Security regulations being the same. R. 87, 118–19. This testimony from the plaintiffs' side of the case in substance concedes that the "Everybody does the same thing" contention is devoid of factual substance.

40. The defunct Examiner Assistant job performed very similar functions as the Examiner I job. R. 198. However, since there were proportionately more whites than blacks who started on the Assistant job (37 per cent of the white hires and 31 per cent of the black hires), the point is of no consequence.

41. The assertion in the plaintiffs' opening statement that the Examiner and Supervisor jobs are not skilled jobs was not supported by any evidence, not even from the plaintiffs' witnesses. The contention is based exclusively on the comments of the court of appeals (854 F.2d at 1297), but those comments have to be taken in the context of the fact that neither the job progression nor minimum experience procedures nor the skill level of the jobs was at issue in the 1986 trial.

42. Based on the undisputed evidence at the 1990 trial, the court finds that the Examiner and Supervisor jobs are skilled positions and are critical to the operation of the agency. R. 178, 261.

43. There are differences among the grades of Examiners in the extent of the knowledge they are expected to have. The written descriptions of the jobs show that the extent of the knowledge of various matters associated with the work which Examiners are expected to have are "some knowledge" for the Examiner I job, "considerable knowledge" for the Examiner II job, and "thorough knowledge" for the Examiner III job. R. 184–85.

44. The adjudication of disability cases by DDS is governed by the Program Operations Manual System [hereinafter "POMS"], which comes from the Social Security Administration and consists of some 12 volumes. R. 184. The matters which Examiners are required to have knowledge of include the multiple volumes of the POMS. Consistent with the job descriptions, Examiner I's are expected to have "some knowledge" of the POMS, Examiner II's are expected to have "considerable knowledge," and Examiner III's are expected to have "thorough knowledge." R. 184–85.

45. There are differences among the levels of the Examiner jobs in the complexity of the cases handled. As Dr. McCoy credibly and convincingly expressed it:

Q—In the progression at Alabama from EI to EII to EIII, are there any differences from one job to the next in terms of the level of responsibility that are placed on the examiners?

A—There is.

Q—Would you explain to the Court what the situation is about that?

A—Well, at the lower level, our Disability Examiner I basically deals with simple claims so to speak that we have determined to be simple. As we move up that ladder, basically what we're getting is our Disability Examiner III's dealing with the very complex cases. By that, I mean your recon and CDR's as well as specialized work loads, work loads that come from the courts or sensitive types of claims as well as specialized functions. They take on more responsibilities.

Q—Is the situation then that EII's do more complex work and have more responsibilities than EI's?

A—They do.

Q—And do EIII's do more complex work and have more responsibilities than EII's?

A—They do.

R. 262.

46. While the evidence on the subject was in sharp conflict, the court finds from the weight of the credible evidence that the least complex type of cases consists of the initial claims, which are for the most part handled by the Examiner I job. R. 187, 257.

47. The career path is "structured so that it begins with the simple and moves toward the complex." R. 265.

48. The Social Security Administration advocates the concept that the entry level job should handle the least complex cases, the next level should handle more complex cases, and the most complex cases would be handled by the highest level Examiner. R. 264–65.

49. There are differences among the grades of the Examiner jobs in the extent to which they work on their own. Examiner I's have a minimum six months training period and even with this training they do not work on their own without assistance from higher ranked Examiners or the Supervisor. R. 183–84. At the next level, Examiner II's are expected to work independently. At the next level, Examiner III's work independently and are further expected to be available to answer questions asked by Examiners with less experience. R. 183–85.

50. The Examiner III job further handles specialized functions at the DDS, in that:

(a) Quality Assurance Specialists need to be familiar with all types of cases, and this position is generally filled by employees in the Examiner III job. R. 190–91.

(b) Vocational Specialists need to know how to handle all types of cases and must be very familiar with the POMS and Department of Labor manuals. This position is filled by employees in the Examiner III job. R. 191–92.

(c) The position of Medical Professional Relations Officer is the liaison between the agency and the medical community throughout the state and needs to be familiar with the medical field. This position is filled by the Examiner III job. R. 192.

(d) Assistant Unit Supervisors have since 1982 been filled by employees in the Examiner III job. R. 192.

51. The plaintiffs' contention that there is no difference among the Supervisors and Examiners except for Supervisors performing evaluations or attending meetings is not borne out by the preponderance of the credible evidence. The responsibilities of the Supervisors include reviewing the work done by Examiners for accuracy, pointing out their mistakes to them, answering questions asked by Examiners, and generally being certain that the work is performed and performed correctly.

52. A high level of expertise is needed in order to function as a Supervisor at DDS. From the vantage point of his experience as Director of both the Connecticut DDS and the Alabama DDS, Dr. McCoy credibly testified that:

[B]ased on my experience, there is a very high level of expertise needed. If you're talking about in terms of knowledge, skills and competencies, what I would have to say they would certainly have to know how to do all types of claims and be familiar with all the rules that are associated with those claims and talking about the Social Security rules and regulations. They certainly have to know all of those regulations that surround claims processing and other aspects of operations, Social Security rules. They need to know something about the medical criteria, the vocational criteria and the age criteria and other types of criteria that are part of that, and they need to know something about administration and the functions, basically how to plan the work and coordinate their work, to monitor what's going on in the operation, identify problems and develop strategies and implement those strategies in order to get the job done.

R. 263.

53. There are differences among the grades of the Supervisor jobs in the levels of responsibilities and in the number of employees for whom they are responsible. As Dr. McCoy testified on this subject:

Q—Now, with respect to supervisors at the Alabama agency, you have three levels of supervisors, SI's, SII's and SIII's. Among those various levels, are there differences in the levels of responsibilities that are placed on those supervisors?

A—There are. As you go up the ladder, you also see an increase not only in the functions but the span of control, the numbers of people for whom they have responsibilities. At our first line, operational level, for the most part, we're seeing the job is described as executive so to speak. It deals with implementation of policies. And as we move on up the line, we're seeing responsibilities for policy making and the high level planning functions within our operation.

Q—Do SII's have more responsibility than SI's?

A—They certainly do.

Q—And do SIII's have more responsibilities than SII's?

A—They do.

R. 263–64.

54. The differences among the grades of the Supervisor jobs in the levels of responsibilities and in the number of employees supervised is illustrated by the role of the Supervisors in the organizational structure:

(a) DDS has a total of 14 Units, with 12 being in the Birmingham office and two in the Mobile office. Each Unit has seven or eight Examiners who are supervised by the Unit Supervisor of the Unit. This first line supervisory function is performed by the Supervisor I job. R. 193.

(b) The Birmingham office, with 12 units, has two Districts, with each having six Units. Each of the two District Supervisors (formerly known as Area Supervisors) is thus responsible for six Unit Supervisors and from 42 to 48 Examiners (seven to eight Examiners per Unit $\times$ six Units = 42 to 48 Examiners). The District Supervisor position is performed by the Supervisor II job. R. 193–94.

(c) The Chief of Operations is responsible for both the Districts and the Units, which in total consists of 12 S–1s, two S–2s and from 84 to 98 Examiners. The Chief of Operations position is filled by a Supervisor III. Another Supervisor III is the manager in charge of the Mobile office.

R. 195–96, 229.

55. The evidence has established that there is a functional relationship between each job in the career path. For example:

(a) The Chief of Operations testified that "in each level Disability Examiner series or the Disability Supervisor series, each level builds on the previous level both in scope, breadth and degree of experience and knowledge that's obtained in those classifications." (Testimony of Stephen S. Scruggs, R. 230.)

(b) An expert in the field of industrial organizational psychology testified, based on a study of the jobs in the career path, that there is a relationship between

the jobs with each job preparing employees to perform the duties of the next higher job. (Testimony of Dr. William E. Farrar, R. 283.)

### B. Minimum Experience Procedure:

56. The procedure of working each job in the career path at least a year before advancing to the next higher job is necessary for the capable and efficient operation of the agency. R. 196, 231, 266.

57. To master the knowledge required, the one-year period is the minimum which would be practicable. R. 266.

58. The evidence presented on the subject included the opinion expressed by an expert witness in the field of industrial organizational psychology that the one-year time-in-grade procedure is the minimum time necessary to prepare employees for the next higher job in the career path. R. 283–84.

59. The conclusion that the one-year minimum experience procedure is necessary is substantiated by the Department of Labor's Dictionary of Occupational Titles [hereinafter "DOT"], which is regarded in the field of industrial psychology as authoritative. Defendants' Exhibits 7 and 8; R. 284–290.

60. The DOT includes a section entitled Specific Vocational Preparation, which explains that:

This represents the amount of time required to learn the techniques, acquire information, and develop the facility needed for average performance in a specific job-worker situation.

Defendants' Exhibit 8 at page 473.

61. The DOT benchmark job for the Examiner jobs is Claims Adjudicator, Government Service. Defendants' Exhibit 7 at page 106; R. 286–87. The time period set by the DOT for Claims Adjudicator, Government Service, is "Over 2 years up to and including 4 years." Defendants' Exhibit 8 at page 473; R. 287–88. In comparison, the one-year procedure at the Alabama DDS means that reaching the highest level Examiner job (E–3) takes a minimum of three years, which is well within the DOT Period of over two years and up to and including four years.

62. The DOT benchmark job for the Supervisor jobs is Supervisor, Government Service. Defendants' Exhibit 7 at page 134; R. 289. The time period set by the DOT for this job is similarly "Over 2 years up to and including 4 years." Defendants' Exhibit 8 at page 473; R. 288. The time to reach the highest level Supervisor job at the Alabama DDS (S–3) is a minimum of two years, which is at the minimum of the DOT time period of over two years up to and including four years.

63. There is no statistically significant difference in the time period in which white and black employees have advanced from one job to the next in the career path at the Alabama DDS. Defendants' Exhibits 11 and 12; R. 321–330.

### C. Summary:

64. The job progression and minimum experience procedures serve, in a significant way, the legitimate employment goals of the Alabama DDS and have a substantial relationship to effective job performance. The evidence on which this finding is based includes the testimony of both the Director of the Agency, Dr. McCoy at R. 266–67, and the opinion expressed by an expert witness on the subject, Dr. Farrar at R. 290.

65. The job progression and minimum experience procedures are necessary to the efficient operation of the DDS. The jobs "do get increasingly difficult, do require increasingly more responsibility, and those jobs require time to master those. Dr. McCoy at R. 268. Without these procedures, an employee who has not followed the career path and worked each job for a year would not be able to perform the range of duties within the time frames established by the Social Security Administration and may grant benefits which should not be granted or deny benefits which should be granted. R. 268.

### VI. HAVE THE PLAINTIFFS SATISFIED THEIR RESPONSE OBLIGATION?

66. With the defendants having satisfied the obligation of justifying the

procedures, the remaining question is whether the plaintiffs have demonstrated that such justification is insubstantial or pretextual or that other procedures would equally serve the agency's interests. *Hill v. Seaboard Coast Line R. Co.*, 885 F.2d 804, 812 (11th Cir.1989).

67. The plaintiffs have not shown that the procedures at issue might be insubstantial or pretextual. The only point in the case which could be an argument on the subject was the assertion that 17 whites started on jobs above the entry level, and the evidence has established without dispute that such assertion is not factually accurate. R. 307–312.

68. The evidence establishes that the procedures at issue serve substantial and significant employment goals and interests.

69. There is nothing pretextual in the evidence regarding the reasons for the procedures at issue or the interests served by these procedures.

70. The plaintiffs suggest the agency's interests would be equally well served if all employees in the career path could bid on or apply for openings at the higher rungs of the ladder without having to progress through each job. For example, under the plaintiffs' theory, Examiner I's could apply for and obtain any of the Supervisor jobs without working the prior jobs in the career path.

71. The plaintiffs offered no evidence on their own in support of this theory. The most which was offered in the way of evidence consisted of cross-examination of the defendants' expert in the field of industrial organizational psychology to the effect that there are places of employment where the position of employees in a line of progression is "a factor to be considered." R. 298–99.[13] This was the only evidence presented by the plaintiffs on the point, and it was insufficient to rebut the substantial evidence presented by the defendants.

72. Based on all the evidence, the court finds that the plaintiffs' theory would not equally serve the legitimate employment goals of the agency and would not be an equally suitable alternative.

73. From all the evidence heard during the three days of trial, the court credits and agrees with the opinion expressed by Dr. McCoy regarding the result which would ensue without the job progression and minimum experience procedures:

> I really think it would be rather chaotic and would result in a tremendous public disservice. My own thinking is that it would render our operation in such a way that we couldn't function maximumly effective and efficiently. And I say efficiently, because the jobs in our shop do get increasingly difficult, do require increasingly more responsibility, and *those jobs require time to master those.*

R. 268.

## CONCLUSIONS OF LAW

1. The plaintiffs have not shown that the job progression and minimum experience procedures perpetuate any past discrimination with respect to the plaintiffs.

2. The plaintiffs have not established a prima facie case by showing that the procedures at issue have created a disparate impact. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); *Hill v. Seaboard Coast Line R. Co.*, 885 F.2d 804 (11th Cir.1989).

3. Alternatively, assuming arguendo that the plaintiffs established a perpetuation of past discrimination or a prima facie case, the result would be that:

(a) Analyzed in the framework of the *Wards Cove* standards, the defendants have carried the burden of producing evidence of a justification for the job progression and minimum experience procedures by showing that such procedures serve, in a significant way, the legitimate employment goals of the employment.

(b) Analyzed in the framework of the pre-*Wards Cove* standards, the defen-

---

**13.** In closing argument, the plaintiffs amplified on this theory by analogy to the situation of employees in a Mechanic I job being able to bid on a Mechanic III job without working the Mechanic II job. R. 386.

dants have carried the burden of proof that the job progression and minimum experience procedures are necessary for the efficient operation of the agency.

4. The job progression and minimum experience procedures are not discriminatory. There is no disparate treatment since the procedures apply to all employees without regard to race, and the plaintiffs' challenge based on the disparate impact theory fails in light of the facts as found from the evidence.